**Darrell WAYBENAIS, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. Civ. 4–89–809.

United States District Court, D. Minnesota, Fourth Division.

Aug. 5, 1991.

Romaine R. Powell, Powell, Land & Schueppert, Bemidji, Minn., for plaintiff.

Kenneth W. Saffold, Asst. U.S. Atty., Minneapolis, Minn., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER FOR JUDGMENT

DIANA E. MURPHY, District Judge.

Plaintiff Darrell Waybenais sued the United States under the Federal Tort Claims Act (FTCA) for personal injuries resulting from gunshot wounds inflicted by Captain Gary Jourdain, a police officer with the Bureau of Indian Affairs (BIA). The government pleaded as an affirmative defense the Minnesota statutory privilege of a police officer to use deadly force as a defense to an intentional tort.

Trial was held before the court. Following trial the parties submitted proposed findings of fact and conclusions of law. The court now submits in memorandum form its findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a), based on its observation of the witnesses and their credibility, and upon review of the exhibits and deposition testimony.

In the early morning hours of July 17, 1988, Waybenais had been drinking heavily in homes in and around Red Lake, Minnesota. He testified that after midnight he consumed about 12 beers and several mixed drinks. When he returned home from partying at about 5 a.m., he took his .22 caliber magnum rifle onto the roof of his house. He did this because he was "drunk and feeling angry." On the roof, he fired numerous shots into the air. He emptied one magazine of shells, reloaded, and emptied a second magazine. He then came down off the roof and went into his room, where he smoked sage. The Red Lake Police Department (BIA) was called with reports of the gunshots, and officers were dispatched around 5:30 a.m.

Waybenais was staying at the residence of Marie Hardy, a relative of his. Her house is located along a highway about one and one-half miles west of the village of Red Lake. A road down the hill to Fuller's Lake is across the highway from the house.

Officers Delwyn Dudley, Dwight Bellanger, and Ben Benson arrived at the scene shortly after the first reports of gunshots. While Benson was parked at the side of the highway, he saw a pickup truck driving on the highway from east to west. As the truck went past the Hardy residence, Benson heard a gunshot. He did not see anything strike the vehicle, but he radioed dispatch to report possible shots at the truck. Officers subsequently blocked off the highway to the east and to the west of the Hardy residence. Officers Benson, Dudley, and Gary Jourdain were on the

west; officers Bellanger and Hegstrom were on the east.

Waybenais came out onto the highway and looked through the scope attached to his rifle at the officers who had stopped to the east of him on the road. Waybenais stated he only did this to identify the officers, but the officers saw that he was pointing the gun towards them. Bellanger ducked behind his patrol car for self-protection.

After he saw the police on the highway, Waybenais went to the Tarnell and McNeal homes nearby. Two individuals who knew Waybenais, Bob McNeal and Albert Spears, Jr., tried to talk him into putting his gun down, but he refused. McNeal and Spears testified that he did not look like his usual self but wild, scared, and paranoid. Rejecting their pleas to put down his gun, he ran across the road and down the approach to Fuller's Lake. There he reloaded his rifle and fired two more shots. Dudley had left his patrol car down by the lake, and he thought Waybenais was shooting at his car. The officers who heard these shots assumed that Waybenais had more ammunition.

Waybenais ran back up from Fuller's Lake and saw the squad car roadblock to the east, so he turned and proceeded west on the road, straight toward the other police roadblock. Spears was pursuing him, still trying to talk him into putting his gun down. Two patrol cars were parked across the highway in front of him, with a small space between them at the center of the road. Dudley, Benson, and Jourdain were crouched behind the cars with their guns trained on Waybenais. Waybenais approached them at a moderate pace, something between a fast walk and a slow run. He was holding the stock of his gun at his hip with the muzzle pointed toward the police officers; the barrel was swinging from side to side in the direction of the officers as he trotted. The officers called out to Waybenais to drop his rifle, a warning which he heard. He continued toward the officers, however, as he was warned repeatedly by them to stop and drop his gun. Spears, still chasing after Waybe-

nais, shouted out, "Don't shoot him". When Waybenais was about nine feet away from Jourdain with his gun pointed in Jourdain's direction, Jourdain fired three shots at him, two of which struck him. After being struck, Waybenais continued to move forward until Spears came up behind him and wrestled him to the ground. One bullet had struck Waybenais in the left testicle and the other struck at waist level on his left side. As a result of these injuries, Waybenais will not be able to father children (he had lost his other testicle during childhood).

Jourdain testified that he shot Waybenais because he feared for his own life and the lives of the other officers. He thought Waybenais would kill him. He was scared, he saw the gun pointed at him, and he felt he had no choice but to shoot Waybenais before being shot himself—"It was either me or him." Jourdain did not look through the sights on his rifle or aim at any particular part of Waybenais. He pointed his gun at Waybenais and shot. Dudley testified that in another second he would have fired at Waybenais had Jourdain not already done so. Dudley stated that he felt his life was in danger. Benson also testified that he felt in danger for his life. He had his revolver drawn, cocked and pointed at Waybenais, but did not fire because Spears was behind Waybenais from Benson's angle. After Spears had wrestled Waybenais to the ground, Benson ran forward, threw his pistol in the ditch so it would not be available to Waybenais, and subdued Waybenais and put him in his patrol car. Benson drove Waybenais to the hospital. It turns out that Waybenais' gun was no longer loaded at the time he was shot.

Waybenais testified that at all times while running toward the officers, he had his gun barrel pointed in the air and never pointed it at them. He was scared and nervous, and although he knew the police were in front of him, he kept on running trying to get between the two parked cars to get away.

Although Waybenais did not intend to shoot at the police officers, the clear and credible testimony of the officers shows

that his gun was in fact pointed toward Dudley, Benson, and Jourdain as he approached them at the roadblock. The officers also had good reason to believe that the gun was pointed toward them earlier when Waybenais was standing at the highway assessing the scene through the scope on his rifle. In addition, they had good reason to fear that Waybenais posed a threat to their safety and the safety of others since Benson had heard a shot when the pickup truck drove by the Hardy residence where Waybenais was shooting. The officers knew that the gun had been loaded because of the multiple shots that had been reported and the shots they heard when Waybenais went down to Fuller's Lake.

In hindsight, this was a tragic sequence of events. Waybenais' gun was no longer loaded at the time he approached the roadblock, and the officers were in reality not endangered. Under all the circumstances, however, the officers reasonably concluded that their lives were in danger. They were faced with a man running toward them with a loaded high-powered rifle, which he kept pointed toward them despite repeated warnings that he drop it. Each of the three experienced officers was afraid for his own life and the lives of his fellow officers. Each felt that it was necessary to shoot Waybenais. Jourdain was the one who actually fired, but Dudley was ready to fire a second a later, and Benson would have fired if Spears had not been in the line of fire. It was in Waybenais' power to take the one action which could have prevented his shooting: to drop his gun and surrender to the police. He heard them order him to drop his gun but refused to do so. He rejected the pleas of Spears and McNeal to hand over his gun. There is no evidence that the officers had any motive to shoot Waybenais other than the immediate threat he posed.

These events were most unfortunate for all involved, but the greatest consequences fell on the plaintiff who suffered serious injuries. He made a good impression at trial and testified about his present sobriety and future plans. His legal claim here cannot succeed, however.

■ The court has jurisdiction over the plaintiff's claim pursuant to 28 U.S.C. §§ 1346(b) and 2671 *et seq.* The sovereign immunity of the United States has been waived for the acts or omissions of law enforcement officers of the United States arising out of an assault or battery. 28 U.S.C. § 2680(h). The Bureau of Indian Affairs police officers are law enforcement officers for purposes of this section. *Treho v. United States,* 464 F.Supp. 113 (D.Nev.1978). Under the FTCA, the United States can be held liable for intentional torts if the government officers involved would be liable under the law of the place where the acts occurred. 28 U.S.C. § 1346(b). Minnesota law applies here.

■ Under Minnesota law, Jourdain used deadly force on Waybenais. Minn. Stat. § 609.066, subd. 1. The use of deadly force by a peace officer is privileged under certain circumstances. The relevant statute reads:

> [T]he use of deadly force by a peace officer in the line of duty is justified only when necessary:
>
> > (1) To protect the peace officer or another from apparent death or great bodily harm....

Minn.Stat. § 609.066, subd. 2. In Minnesota the statutory privilege of a police officer to use deadly force is a defense to an intentional tort. *Murphy v. Minneapolis,* 292 N.W.2d 751, 754 (Minn.1980). The government bears the burden of proof in establishing its affirmative defense of privilege.

The court concludes that the government has met this burden and established that Jourdain's conduct was privileged under Minnesota law. Under all the circumstances, in light of the testimony and exhibits received at trial, the government has established each essential element of the affirmative defense of privilege. Jourdain's use of deadly force was in the line of duty, and it was necessary to protect himself and other police officers from apparent death or great bodily harm. Since the government has established its affirmative

**310**

defense, plaintiff's claim is barred and should be dismissed.

## ORDER FOR JUDGMENT

Accordingly, based upon the above, and all the files, records, and proceedings herein, IT IS HEREBY ORDERED that plaintiff's complaint is dismissed with prejudice.